**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| CFX US CO. INC., *et al.*,[1] | : Case No. 22-10022 (DSJ) |
| | : |
| Debtors. | : (Joint Administration Requested) |
| | : |

### DECLARATION OF MICHAEL G. LONG IN SUPPORT
### OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Michael G. Long, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1.      I am the Chief Financial and Chief Operations Officer (the "CFO/COO") of CFX US Co., Inc. ("CFX US") and CFX CDO Co., Inc. ("CFX CDO"), the above-captioned debtors and debtors-in-possession in these chapter 11 cases (together, the "Debtors" or the "Company"). I have over 20 years' experience in the beauty industry. In my capacity as CFO/COO, I have overseen the preparations for the Debtors' chapter 11 filings and have been involved with, among other things, negotiating with certain of the Debtors' key constituencies. As a result, I am familiar with the day-to-day operations, business, and financial affairs of the Debtors. I submit this declaration (the "Declaration") (i) in support of the voluntary petition for relief filed by the Debtors today, January [11], 2022 (the "Petition Date") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed concurrently herewith and discussed herein (collectively, the "First Day Motions") and (ii) to

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CFX US Co., Inc. (5846) and CFX CDO Co., Inc. (1390). The location of the Debtors' service address is: Arent Fox LLP, Attn: George P. Angelich, 1301 Avenue of the Americas, Floor 42, New York, New York 10019.

explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under Chapter 11.

2.      I have reviewed the First Day Motions or otherwise had their contents explained to me and, to the best of my knowledge as I have been able to determine after reasonable inquiry, I believe that approval of the relief requested therein is necessary to permit an effective transition into Chapter 11, collect the Debtors' outstanding receivables, and execute an orderly court-supervised process that provides for meaningful distributions to the Company's creditors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  I am duly authorized to submit this Declaration and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

### I.      HISTORY OF DEBTORS' BUSINESS

4.      CFX US is a Delaware corporation and a wholly-owned subsidiary of Cover FX Skin Care Holdings ULC, a company incorporated and existing under the laws of Nova Scotia, Canada (the "ParentCo"). ParentCo also holds 100% of the shares of CFX CDO, a company incorporated and existing under the laws of Ontario, Canada.  Prior to the sale to AS Beauty Group, LLC ("AS Beauty"), CFX CDO owned substantially all of the Company's intellectual property, as well as proprietary technologies and formulas, which were incorporated into the products sold by CFX US.  Meanwhile, CFX US is responsible for substantially all of the Company's sales,

2

accounting, marketing, e-commerce, back-office, and personnel and owns the majority of the business's cash and receivables.

5.       The Company was founded in 2000 and originated from a Toronto, Canada clinic for women with skin issues and sensitivities.  The Company operated as a cosmetics and skincare producer with a focus on clean, high-performance, vegan, and cruelty-free products.  The Company's products incorporate proprietary technologies and formulations, many of which the Company owned.  The Company utilized various distribution channels, including its own direct-to-consumer ("DTC") e-commerce website, authorized retailer websites, and brick-and-mortar retail stores to advertise, market, and sell its products.

6.       **Prepetition Debt Obligations:**   As of the Petition Date, the Debtors owe approximately $47,226,192.04 in unsecured obligations. In addition, the Debtors are party to a series of promissory notes with the Missouri Local Government Employees' Retirement System ("MOLAGERS"), including (i) a secured Promissory Note dated November 29, 2019 in the principal amount of $2,750,000; and (ii) a secured Promissory Note dated May 14, 2020 in the principal amount of $3,000,000 (together, the "Promissory Notes"), as well as certain related security agreements and other instruments pursuant to which MOLAGERS obtained a perfected security interest in the Debtors' cash, receivables, and other assets.  Prior to the closing of the sale with AS Beauty, the total amount the Company owed to MOLAGERS under the Promissory Notes was approximately $6,870,000.   As described below, this total amount has since reduced. The Company also owed approximately $243,000 in secured debt to Beauty HoldCo, LLC ("BHC"), which was satisfied at the closing prior to the Petition Date.  BHC is a shareholder of ParentCo and MOLAGERS is an investor in BHC.

## II.   LEAD UP TO CHAPTER 11.

7.      The Company's operations suffered predominantly from the loss over the past two years of its two largest customers.  Although the compounding effects of COVID-19 pushed the Company toward DTC and e-commerce with some success, the growth on that side of the Company's business did not make up for the loss of the Sephora and Ulta sales channels.

### A.      Brick-and-mortar sales channels sever ties with the Company.

8.      In 2019, sales for Sephora USA, Inc. and Sephora Asia Pte. Ltd. (together, "Sephora") totaled $6.1 million—more than 40% of the Company's US retail business and nearly a third of the Company's business overall.  However, by early 2020, the Company and Sephora were in discussions about a termination of their business relationship.  The Company and Sephora entered into a Termination and Release Agreement on May 6, 2020 and a Settlement Agreement on November 19, 2020 which closed out the business relationship.

9.      The Company entered 2021 with an ambitious, strategic growth plan intended to scale its revenue, improve margins and spread brand awareness to accord with the macroeconomic shift in retail business toward online markets.  In particular, the Company sought to expand its distribution internationally, leverage its influencer network and social media presence to grow brand awareness, drive customers to its DTC website and partner with new and existing third-party e-commerce retailers, and develop new products to expand its catalog.  However, this plan was disrupted when the Company received notice in late June 2021 that Ulta Beauty LLC ("Ulta") would seek to end its brick-and-mortar relationship with the Company.  Following Sephora's departure in 2020, Ulta had in the previous year accounted for nearly half of the Company's U.S. retail business and more than 30% of the company's business overall.

4

10.     With the combined loss of Sephora and Ulta over a two-year period, the Company

stood to lose two-thirds of its business.[2]  Although the Company saw increases year-over-year in

its e-commerce business, and projected increases in its e-commerce sales over the coming years,

those increases would not be sufficient to cover the loss of business from both Sephora and Ulta.

It became clear to the Company that, although its brand was viable and had potential for growth

and sustainability, the Company needed to consider strategic alternatives.

**B.     The Company prepares and engages in a strategic asset sale.**

11.     In August 2021, the Company began to explore strategic alternatives, including a

sale of the business.  On August 18, 2021, SSG Capital Advisors, LLC ("SSG") was retained to

serve as the Company's investment banker.  SSG contacted a total of 276 parties.  Of those, 38

executed NDAs to access the data room maintained by SSG.  Ultimately, the Company received

four indications of interest in a potential transaction (each an "IOI").  The Company and its

advisors engaged in extensive discussions, negotiations, and diligence with these parties.

12.     On October 11, 2021, the Debtors selected an IOI submitted by a party other than

AS Beauty ("Confidential Bidder X").  The Debtors committed significant time and resources to

the potential transaction with Confidential Bidder X.  On November 30, 2021, citing concerns such

as the surge in the Omicron variant of COVID-19, Confidential Bidder X withdrew and refused to

proceed with the transaction.  After the withdrawal of Confidential Bidder X, the Company re-

engaged with other interested parties and ultimately elected to pursue a transaction with AS

Beauty.

13.     On December 23, 2021, the Company sold the brand, e-commerce platform and

inventory to AS Beauty in exchange for: (i) $1 million in cash consideration, and (ii) an earn-out

---

[2]     In 2019, Sephora and Ulta sales totaled approximately $13.6 million.  Company sales in all markets totaled
approximately $19.7 million.

AFDOCS/24865084.2

22-10022-dsj   Doc 5   Filed 01/12/22   Entered 01/12/22 00:23:08   Main Document
Pg 6 of 23

of 7.5% on sales for thirty (30) months (the "<u>AS Beauty Sale</u>").  The Company retained its cash, receivables existing as of the closing, and other assets.  The Company used the $1 million proceeds to pay BHC's secured debt in full, a portion of MOLAGERS' secured debt, charges from warehouses that were necessary to ensure the release of the Company's inventory free and clear of warehouseman liens, and other costs at closing.  The earn-out, which the Company's advisors projected to be worth between $750,000 and $1,237,500 depending on the growth of the brand during the earn-out period, was assigned to MOLAGERS in exchange for a release of its liens on the assets sold to AS Beauty. While the earn-out payments are not expected to satisfy MOLAGERS' debt in full, each earn-out payment will result in a reduction of MOLAGERS' secured debt.  Coupled with the payoff of BHC's secured debt in full, the Company has used the AS Beauty Sale to satisfy a portion of its secured debt obligations.

14.    The Debtors continue to transition certain elements of the "Cover FX" brand to AS Beauty pursuant to the Asset Purchase Agreement and related agreements with AS Beauty. Following the closing of the AS Beauty Sale, the Company formulated a chapter 11 plan (the "<u>Plan</u>") by which the Debtors will preserve and collect their remaining assets, while the transition to the buyer continues for a period during these chapter 11 cases, use their cash and receivables to make distributions to their creditors—including a carve-out for general unsecured creditors—and ensure an orderly and equitable, court-supervised process.  The Plan is specifically premised on a Secured Creditor Compromise that contemplates, among other things, (a) distributions to MOLAGERS being funded, in part, through the maintenance of the earn-out assignment; (b) a carve-out of $50,000 in collected accounts receivable from MOLAGERS' security interests in order to fund a distribution to general unsecured creditors; and (c) mutual releases between the Debtors and MOLAGERS.

6

AFDOCS/24865084.2

C.    **Current Status of the Debtors.**

15.    Although the Debtors have sold their brand and inventory to AS Beauty Sale, the Debtors are engaged in commercial activities.  I have been employed by the Debtors since February 2021.  The Debtors still retain a staff accountant who has been employed with the Company since June 2019.  We both remain actively involved in the management of the Debtors, including managing the company's cash and accounting systems, effectuating the transition of the brand to AS Beauty and responding to their requests, preparing documents and information in connection with the chapter 11 cases, and locating and collecting accounts receivable.

III.    **EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

16.    The Debtors have filed a number of First Day Motions designed to facilitate their transition into, and exit out of, these chapter 11 cases.  The Debtors anticipate that the Court will conduct a hearing on or soon after the Petition Date at which the Court will hear and consider all of the First Day Motions.  Also contemporaneously herewith, the Debtors filed their Schedules, Statement of Financial Affairs, and Plan.  Additionally, the Debtors filed today a motion seeking relief on several procedural facets of these cases, including, among other things, (i) scheduling a hearing regarding confirmation of the Debtor's Plan (the "Confirmation Hearing"); (ii) establishing relevant deadlines to object to confirmation of the Plan and file proofs of claim; (iii) approving procedures for notice of the Confirmation Hearing and the relevant deadlines; and (iv) establishing procedures and deadlines to solicit votes on the Plan.

17.    I reviewed each of the First Day Motions with Debtors' counsel, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and will be necessary and critical to the Debtors' ability to successfully manage their business affairs, and is in the best interest of the Debtors' estates and creditors.  A description of the relief requested and the fact supporting each of the pleadings is set forth below.

7

A.  **Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule  1015(b) Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

18.    Pursuant to the Scheduling and Solicitation Motion, the Debtors seek entry of an order directing the joint administration of their bankruptcy cases for procedural purposes only, so that a single docket and file will be utilized for both cases for administrative matters and the filing of all pleadings, notices, orders, and other papers.  I believe that the relief requested in the Joint Administration Motion, which will permit the Debtors to administer their chapter 11 cases without managing duplicate pleadings and administration in both cases, is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to smoothly effectuate the collection of receivables, provide for distributions, and execute an orderly wind down.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Joint Administration Motion.

B.  **Debtors' Emergency Motion for Entry of an Order (I) Scheduling Hearing on Confirmation of Plan; (II) Fixing Deadline to Object to Plan; (III) Approving Manner of Notice of Commencement, Confirmation Hearing, and Objection Deadline; (IV) Approving Form and Manner of Solicitation and Voting Procedures; (V) Approving Redaction of Certain Personally Identifiable Information from the Debtors' Creditor Lists; and (VI) Granting Related Relief (the Scheduling and Solicitation Motion").**

19.    Pursuant to the Scheduling and Solicitation Motion, the Debtors seek entry of an order:

   a)  scheduling the Confirmation Hearing on the Debtors' Plan;

   b)  establishing the deadline (the "Objection Deadline") to object to confirmation of the Plan;

   c)  approving the manner of the notice (the "Notice Procedures") of the commencement of the Debtors' chapter 11 cases, the Combined Hearing, and the Objection Deadline (the "Scheduling Notice");

   d)  approving the form and manner of solicitation and voting on the Plan (the "Solicitation Procedures");

AFDOCS/24865084.2

e) approving the filing of the Debtors' lists of creditors with the home mailing addresses of former employees redacted; and

f) granting related relief.

20.     In connection with the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the following schedule (the "Proposed Confirmation Schedule") subject to the Bankruptcy Court's availability:

| Event | Proposed Date/Deadline |
|---|---|
| Petition Date | January 11, 2022 |
| First Day Hearing | [Based on Court's Availability] |
| Solicitation Commencement Date | January 14, 2022 |
| Plan Supplement Filing Deadline | February 17, 2022 at 11:59 p.m. (prevailing Eastern Time) |
| General Bar Date | |
| Voting Record Date | |
| Plan Objection Deadline | February 18, 2022 |
| Voting Deadline | |
| Plan Objection Reply Deadline | February 23, 2022 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to file proposed confirmation order | |
| Deadline to file brief in support of confirmation | |
| Confirmation Hearing | First Available Date on or After February 28, 2022 |

21.     I have been informed that a debtor is typically required to provide notice of a hearing to consider confirmation of a plan to all creditors. I have also been advised that the Debtors seek to serve a combined notice of the commencement of these chapter 11 cases and the Confirmation Hearing to all classes of creditors in this case, the Subchapter V Trustee once appointed, and the Office of the United States Trustee.

AFDOCS/24865084.2

22.     The Scheduling Notice sets forth the deadline and procedures for filing objections
to the confirmation of the Plan, the manner in which the Plan and other pleadings filed in these
chapter 11 cases can be obtained or viewed electronically, and a summary of the treatment of each
class under the Plan.

23.     I believe that the relief requested in the Scheduling and Solicitation Motion is in
the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable
the Debtors to fulfill their obligations in these chapter 11 cases and collect outstanding receivables
to fund distributions to creditors.  The Debtors' liquid resources, and cash and accounts receivable
are encumbered by MOLAGERS.  MOLAGERS has agreed to a limited amount of funding for the
Debtors to effectuate an orderly process collecting assets, reconciling claims, and paying creditors,
as proposed in the Proposed Confirmation Schedule.  I am not aware of any alternative process or
timeline, particularly without the support of MOLAGERS, that would have any reasonable
likelihood of  producing results for the estates as positive as the results projected under the Plan
and Proposed Confirmation Schedule.  To the contrary, delays in the confirmation schedule will
jeopardize the Debtors' ability to emerge from chapter 11 and pay dividends to unsecured
creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court
should approve the Schedule and Solicitation Motion.

**C.      Emergency Motion Application for an Order (I) Setting Bar Dates for
Submitting Proofs of Claim; (II) Approving Procedures for Submitting Proofs
of Claim, and (III) Approving Notice Thereof (the <u>Bar Date Application</u>").**

24.     Pursuant to the Bar Date Application, the Debtors seek entry of an order:

a)  establishing **February 17, 2022 at 11:59 p.m. (prevailing Eastern Time)** as
the deadline for each person (as defined in Bankruptcy Code section 101(41)),
excluding governmental units (as defined in Bankruptcy Code section 101(27),
the "<u>Governmental Units</u>"), to file a proof of claim (each, a "<u>Proof of Claim</u>,"
and collectively, the "<u>Proofs of Claim</u>") in respect of any prepetition claim (as
defined in Bankruptcy Code section 101(5)), including, for the avoidance of

10

doubt, secured claims, priority claims against the Debtors, and administrative claims pursuant to section 503(b)(9) (such deadline, the "General Bar Date");

b) establishing **July 12, 2022 at 11:59 p.m. (prevailing Eastern Time)** (one hundred eighty (180) days after the date of the order for relief) as the deadline for Governmental Units to file a Proof of Claim in respect of any prepetition claim against the Debtors (such deadline, the "Governmental Bar Date," and together with the General Bar Date, the "Bar Dates");

c) approving the proposed procedures for filing Proofs of Claim; and

d) approving the proposed procedure and form of notice for providing notice of the Bar Dates.

25.    I have been informed that a debtor is typically required to provide notice to its creditors of the process for submitting proofs of claim, and set deadlines for doing so. The Debtors' proposed Bar Date Notice would set forth those relevant Bar Dates and provide notice to all of the Debtors' creditors. I believe that the relief requested in the Bar Date Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to effectuate a smooth wind down in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Bar Date Application.

**D.    Emergency Motion for Entry of an Order Pursuant to Sections 105(a), 345(b), 363(c) and 364(a) of the Bankruptcy Code (I) Authorizing the Debtors to Continue to use Existing Cash Management System and Legacy Bank Accounts, and (II) Granting Related Relief (the "Cash Management Motion").**

26.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order: (a) authorizing but not directing the Debtors to continue to use their existing Cash Management System and Legacy Bank Accounts, subject to two changes:  (i) no distributions or payments (other than any applicable bank fees) shall be made from the Legacy Accounts; and (ii) the Debtors shall sweep any funds from the Legacy Accounts into the DIP accounts with Signature Bank, except such funds as are minimally necessary to be maintained in the Legacy Accounts to keep such accounts open; and (b) granting related relief.

11

27.     Prior to the Petition, the Debtors maintained in the ordinary course of business one bank account with Chase (Account No. Ending in 6386) and four bank accounts with RBC (Account Nos. Ending 2666, 9223, 1285, and 3430), which received all of the Debtors' cash receipts (together, the "Legacy Accounts").  The Company also paid all of its expenses from these Legacy Accounts.  Shortly before filing these chapter 11 cases, the Company transitioned nearly all funds from Legacy Accounts to Signature Bank accounts meeting all requirements of Bankruptcy Code section 345 and listed as an Authorized Bank Depository by the Office of the United States Trustee for the Southern District of New York.  However, the Debtors expect that customers and other parties will continue to deposit funds into the Legacy Accounts after the Petition Date.

28.     For example, the Debtors expect significant accounts receivable to be direct deposited into the Chase Legacy Account, and a large Canadian tax refund to be direct deposited into a Legacy RBC Account.  The Debtors wish to keep such Legacy Accounts open to accept deposits.  In my experience, requesting a customer to modify its existing records regarding direct deposits of amounts owed can create confusion and lead to delays or errors in the transmission of funds.  In order to ensure the Debtors make any of their own transactions solely through the Signature Bank accounts, like payment of operational expenses and ultimately funding of distributions, the Debtors will put into place a system to regularly and timely (*i.e.*, at least once per week) transfer deposits from the Legacy Accounts to the Signature Bank accounts.

29.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest, and will enable the Debtors to continue to effectuate a smooth wind down without disruption.  Accordingly, on behalf of the

12

AFDOCS/24865084.2

Debtors, I respectfully submit that the Bankruptcy Court should approve the Cash Management Motion.

      **E.**      **Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Executory Contracts Effective as of the Petition Date and (II) Granting Related Relief (the "<u>Rejection Motion</u>").**

      30.      Pursuant to the Rejection Motion, the Debtors seek entry of an order (a) authorizing the Debtors to reject identified executory contracts, retroactive to the Petition Date; and (b) granting related relief.  The Debtors are party to several executory contracts that were entered into to manage the Company's brand, e-commerce platform and inventory.  However, the Debtors have since sold those assets to AS Beauty, and as part of the AS Beauty Sale (a) transitioned certain contracts to AS Beauty, and (b) terminated certain contracts in accordance with their terms.  The remaining contracts provide no remaining benefit to the Debtors' estates, are costly, and only serve as a burden on the estates and, therefore, on the prospects of distributions to creditors.  A retroactive rejection of the Debtors' executory contracts will benefit the Debtors' estates by cutting off any further obligations of the Debtors on these contracts.

      31.      I believe the relief requested in the Rejection Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest, and will enable the Debtors to continue to effectuate a smooth wind down without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Rejection Motion.

AFDOCS/24865084.2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 11, 2022
     New York, NY

*/s/ Michael G. Long*
Michael G. Long

14

**CFX US CO., INC. and CFX CDO CO., INC.**
**AFFIDAVIT PURSUANT TO LOCAL RULE 1007-2**

## SCHEDULE 1

Pursuant to Local Rule 1007-2(a)(4), the Debtors list below the relevant information with respect to each of the holders of the Debtors' twenty-four (24) largest unsecured claims as of January 11, 2022, excluding insiders:

| CREDITOR | CREDITOR CONTACT | AMOUNT OF CLAIM | AMOUNT OF CLAIM PARTIALLY SECURED | CONTINGENT/ UNLIQUIDATED DISPUTED |
|---|---|---|---|---|
| Albea Beauty Solutions USA LLC<br>PO Box 824397<br>Philadelphia, PA 19182-4397 | James Omelia<br>Supply Chain Manager<br>James.Omelia@group-ibg.com | $225,750.00 | | |
| Facebook, Inc.<br>15161 Collections Center Drive<br>Chicago, IL 60693 | Attn: AR<br>ar@fb.com | $100,000.00 | | |
| Listrak, Inc.<br>100 W. Millport Road<br>Lititz, PA 17543 | Rachel Leonard<br>Rachel.Leonard@listrak.com | $32,986.74 | | Contingent<br>Unliquidated<br>Disputed |
| Randstad<br>PO Box 2084<br>Carol Stream, IL 60132-2084 | Swathi Sree<br>Swathi.stree@randstadusa.com | $27,029.67 | | |
| CSR Cosmetic Solutions Inc.<br>PO Box 29052<br>RPO Wellington Plaza<br>Barrie, ON<br>Canada, L4N 7W7 | Laura Vaughn/ Dylan Lindsay<br>DLindsay@crscs.ca | $26,843.46 | | |

| | | | | |
|---|---|---|---|---|
| Oracle America Inc.<br>500 Oracle Parkway<br>Redwood Shores, CA 94065 | Brett Elliott – VP | $16,920.74 | | |
| Jones Day<br>PO Box 70294<br>Cleveland, OH 44190-0294 | c/o McMillan (Sharon Groom)<br>Sharon.groom@mcmillan.ca | $12,862.50 | | |
| Tigers (USA) Global<br>Logistics<br>Dept CH 19499<br>Palatine, IL 60055 | Amber Peters<br>Amber.Peters@go2tigers.com | $11,127.49 | | |
| Omniante Enterprises LLC<br>d/b/a DigiShopGirlMedia<br>4616 25th Ave NE #151<br>Seattle, WA 98105 | Katya Constantine<br>katya@digishopgirl.com<br>(206) 669-1547 | $10,000.00 | | |
| Bellwyck Inc.<br>PO Box 57733<br>STN A<br>Toronto, ON M5W 5M5 | Ewa Sosnowski, Collections<br>esosnowski@bellwyck.com | $9,240.22 | | |
| Northwest Cosmetic<br>Laboratories LLC<br>d/b/a Elevation Labs – Idaho<br>2105 Boge Ave<br>Idaho Falls, ID 83401 | Lee Foster, Account Manager<br>Lee.Foster@elevationlabs.com | $8,162.16 | | |
| Market Defense LLC<br>United Federal Credit Union<br>1441 Patton Avenue<br>Asheville, NC 28806 | Brandon Pemberton, SVP, Client<br>Engagement<br>(206) 686-8100 | $8,025.00 | | |
| The Cincinnati Insurance Co.<br>PO Box 145620<br>Cincinnati, OH 45250 | Sean M. Givler, Sr., V.P.<br>(513) 870-2000 | $5,849.00 | | |

| | | | | |
|---|---|---|---|---|
| Right Side Up LLC<br>9901 Brodie Lane, Suite 160<br>PMB515<br>Austin, TX 78748 | Tyler Elliston<br>tyler@rightsideup.co<br><br>bianca@rightsideup.co; | $5,220.00 | | |
| Break The Web, Inc.<br>10946 S Kelso Dune Dr.<br>South Jordan, UT 84009 | Rachel Lentner<br>rachel@breaktheweb.org<br>(866) 337-1909, ext. 103 | $2,920.00 | | |
| China Sinda<br>11/F, Tower B<br>Focus Place<br>19 Financial Street<br>Beijing 100033<br>China | | $1,798.00 | | |
| GS1 Canada<br>c/o TH1029<br>PO Box 4283<br>Postal Station A<br>Toronto, CA M5W 5W6 | | $1,176.89 | | |
| JAS Forwarding USA Inc.<br>6165 Barfield Road<br>Atlanta, GA 30328 | Farrah Gayapersad<br>Farrah.gayapersad@go2tigers.com | $1,130.00 | | |
| Rakuten Marketing LLC<br>PO Box 415613<br>Boston, MA 02241-5613 | President<br>president@mail.rakuten.com | $1,027.75 | | |
| Total Solutions, Inc.<br>5100 South Service Road<br>Unit 28<br>Burlington, ON L7L 6A5 | Emilia Sirianni<br><br>emilia@totalsolutionsinc.com | $981.68 | | |

| | | | | |
|---|---|---|---|---|
| Stewart McKelvey<br>Purdy's Wharf Tower I<br>PO Box 997<br>Halifax, NS B3J 2X2 | Rose Hartlen-Brown, Legal Assistant<br>rmhartlen@stewartmckelvey.com | $686.61 | | |
| N.C. Department of Revenue<br>PO Box 25000<br>Raleigh, NC 27640 | | $166.21 | | |
| Commonwealth of Massachusetts<br>Massachusetts Department of Revenue<br>PO Box 7089<br>Boston, MA 02241-7089 | | $102.40 | | |
| Hawke Media LLC<br>1714 16th Street<br>Santa Monica, CA 90404 | Kathleen English<br>Kenglish@hawkemedia.com | $0.00 | | |

## SCHEDULE 2

Pursuant to Local Rule 1007-2(a)(5), the Debtors list below the relevant information with respect to the Debtors' only secured creditor as of January 11, 2022:

| CREDITOR | CREDITOR CONTACT | AMOUNT OF CLAIM | COLLATERAL SECURING CLAIM | CLAIM/ LIEN IS DISPUTED |
|---|---|---|---|---|
| Missouri Local Government Employee Retirement System (MOLAGERS) 701 W. Main Street PO Box 1665 Jefferson City, MO 65102 | Megan Loehner | $6,771,224.80 | Secured Promissory Notes | No. |
| | | | **VALUE OF COLLATERAL** | |
| | | | $2,583,000.00 | |

## SCHEDULE 3

Pursuant to Local Rule 1007-2(a)(6), the Debtors list below estimates of each Debtor's assets and liabilities as of January 11, 2022:

### CFX US CO., INC.

| SUMMARY OF ASSETS | |
|---|---|
| Real Property | $0.00 |
| Personal Property | $1,010,043.64 |
| Total Property | $1,010,043.64 |

| SUMMARY OF LIABILITIES | |
|---|---|
| Secured Claims | $6,771,224.80 |
| Priority Unsecured Claims | $0.00 |
| Nonpriority Unsecured Claims | $34,195,666.24 |
| Total Liabilities | $40,966,891.04 |

### CFX CDO CO., INC.

| SUMMARY OF ASSETS | |
|---|---|
| Real Property | $0.00 |
| Personal Property | $540,613.88 |
| Total Property | $540,613.88 |

| SUMMARY OF LIABILITIES | |
|---|---|
| Secured Claims | $6,771,224.80 |
| Priority Unsecured Claims | $0.00 |
| Nonpriority Unsecured Claims | $13,030,525.80 |
| Total Liabilities | $19,801,750.60 |

## SCHEDULE 4

Pursuant to Local Rule 1007-2(a)(10), the Debtors list below (a) the location of the Debtors' substantial assets, (b) the location of their books and records, and (c) the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of the Debtors' Substantial Assets**

As of January 11, 2022, the Debtors' assets are located substantially in a business checking account with JPMorgan Chase Bank, four business checking accounts with Royal Bank of Canada, and three section 345-qualified Signature Bank accounts, combined which hold approximately $331,430.22.

**Location of the Debtors' Books and Records**

As of January 11, 2022, the Debtors' books and records are located at with Huebscher & Co., Attn: Eric Huebscher, 630 3rd Avenue, 21st Floor, New York, NY 10017; and with MNP LLP, 111 Richmond St. West, Suite 300, Toronto, ON; M5H 2G4 Canada.

**Debtors' Assets Outside of the United States**

As of January 11, 2022, the Debtors have four Royal Bank of Canada business checking accounts.

## <u>SCHEDULE 5</u>

Pursuant to Local Rule 1007-2(a)(12), the Debtors list below the individuals who comprise the Debtors' existing senior management:

| OFFICER | RESPONSIBILITIES AND EXPERIENCE |
|---|---|
| Michael G. Long<br>Chief Financial Officer and<br>Chief Operating Officer | Mr. Long has been employed by the Debtors since February 2021. Mr. Long has more than 20 years' experience in the beauty industry. In the lead-up to this chapter 11 case, Mr. Long has overseen the preparation of the chapter 11 filing, negotiated with key constituencies, managed the Debtors' cash and accounting systems, effectuated the transition of the Cover FX brand to AS Beauty and responded to their requests, and located and collected accounts receivable. |

## SCHEDULE 6

The Debtors attest that, to the best of the Debtors' knowledge, as of January 11, 2022, the below requirements of Local Rule 1007-2 are inapplicable to the Debtors.

| SUBSECTION | REQUIREMENT | REASON |
|:---:|:---:|:---:|
| (a)(7) | The number and classes of shares of stock, debentures or other securities of the debtor that are publicly held, and the number of holders thereof, listing separately those held by each of the debtor's officers and directors and the amounts so held. | The Debtors have issued no publicly-held securities. |
| (a)(8) | A list of all of the debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending. | The Debtors have no property in the possession or custody of any custodian or other person. |
| (a)(9) | A list of the premises owned, leased or held under other arrangement from which the debtor operates its business. | The Debtors do not currently own, lease, or hold any premises from where they operates their business. |
| (a)(11) | The nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent. | The Debtors have no action or proceeding against them or their property. |